UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )           2:23-CR-83
                                    )
    vs.                             )
                                    )
SHEA CHAPMAN,                       )
                                    )
            Defendant.              )

## REPORT AND RECOMMENDATION

Defendant filed a Motion to Suppress [Doc. 32] seeking the suppression of both the physical evidence obtained from Defendant's vehicle and person during a traffic stop and the statements he made during the stop. The United States filed a Response [Doc. 41] in opposition to Defendant's Motion to Suppress. The Court held a hearing to address the Motion to Suppress on January 23, 2024. Present at the hearing were Defendant and his counsel, Bryce W. McKenzie, Esq., and Assistant United States Attorney Emily Swecker. The United States called Kingsport Police Department Detective Jesse Altman and Tennessee Highway Patrol Troopers Christopher Vaughan and Joshua Barner as witnesses during the hearing.

This matter is before the Court pursuant to 28 U.S.C. § 636(b) and the standing orders of the District Court for a Report and Recommendation and is now ripe for resolution. For the reasons stated herein, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress [Doc. 32] be **GRANTED in part by agreement and in all other respects be DENIED**, as specifically addressed below.

## I. BACKGROUND

On July 18, 2023, a federal grand jury returned an indictment against Defendant charging him with conspiracy to distribute 40 grams or more of a mixture and substance containing fentanyl in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B); possession with intent to distribute a mixture and substance containing fentanyl in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C); possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A); and being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). These charges arose from a March 1, 2023 traffic stop of a vehicle in which Defendant was a passenger that took place on Interstate 26 near mile marker 33. Officers ultimately searched Defendant's person and the vehicle, discovering suspected methamphetamine, fentanyl, a pistol, and a gun holster on Defendant's person and locating two additional firearms, a glass pipe, and a scale in the vehicle. Additionally, law enforcement obtained statements from Defendant at the scene of the traffic stop.

In his Motion to Suppress [Doc. 32] and related Supplement [Doc. 43], Defendant raises three issues. First, Defendant argues that the length of the traffic stop was impermissibly extended beyond the time necessary to complete the purpose of the stop. [Doc. 43, p. 2]. Additionally, Defendant asserts that officers conducted a patdown of his person without reasonable suspicion in violation of the Fourth Amendment's prohibition on unreasonable searches and seizures. [Doc. 32, p. 3]. Finally, Defendant contends that "any statements he gave to officers based upon their questioning while he was locked in the back of a cruiser in handcuffs are inadmissible pursuant to Miranda." [Doc. 32, p. 6].[1]

---

[1] Defendant initially challenged the search of the vehicle, but later withdrew this challenge because he lacks standing as he was merely a passenger in his girlfriend's vehicle during the stop. *See* [Doc. 43, p. 1].

In response, the United States argues that the patdown of Defendant's person was supported by reasonable suspicion. [Doc. 41, p. 6-9].[2] The Government concedes that Defendant was initially questioned without having been advised of his *Miranda* rights and states that it does not intend to introduce Defendant's pre-*Miranda* statements. [Doc. 41, p. 12]. At the same time, the United States asserts that the statements Defendant made during the patdown are admissible, as well as statements Defendant made after he had been advised of and waived his *Miranda* rights. [Doc. 41, p. 12-13]. The Court offered both parties an opportunity to file supplemental, post-hearing briefs on the *Miranda* issue. The United States filed a supplemental brief [Doc. 48] in which it specifically argues that the post-*Miranda* statements Defendant made to Special Agent Scott Lott with the Tennessee Bureau of Investigation ("TBI") are admissible.

## II. SUMMARY OF TESTIMONY AND FINDINGS OF FACT

Kingsport Police Department ("KPD") Detective Jesse Altman ("Det. Altman"), who served as the lead investigator for Defendant's case, testified during the hearing. Det. Altman has served for three years as a detective in the KPD narcotics unit and is a member of the TBI drug-related deaths task force. Det. Altman advised that his investigation into Defendant began on December 5, 2022, after suspected fentanyl and marijuana were found by a KPD patrol officer during a traffic stop. After the traffic stop, Det. Altman spoke with the subject of the stop[3] to determine the source of the drugs found in her possession, and she identified Defendant as a drug dealer who she had observed to be in possession of large amounts of fentanyl and methamphetamine. During the investigation, Det. Altman spoke with three separate sources, all of

---

[2] The United States did not directly address the length of the traffic stop in its Response, but the issue was addressed during the suppression hearing. The Court notes that Defendant's initial Motion to Suppress [Doc. 32] focused on probable cause to search the vehicle which explains why the United States did not address the issue in its initial Response.

[3] The subject of the stop is the first confidential source that Det. Altman spoke with during his investigation.

whom described Defendant as a drug dealer and/or supplier who sometimes goes by the street name "Gucci." These sources also reported that Defendant owned firearms and was unstable and violent. One of the sources, a paid confidential informant referred to as "Pedro," described an incident during which he, Defendant, and several other people were in an apartment at Model City Apartments belonging to an individual with the street name "Grip" when Defendant became upset because he could not find his flashlight. Because he thought someone had taken the flashlight, Defendant took everyone's cell phones and held them at gunpoint while instructing them to take off their clothes. Pedro reported that Defendant frequently had these types of violent outbursts. Another of these sources, who also spent time with Defendant at Grip's apartment, told Det. Altman that Defendant had a practice of wearing a bullet-proof vest and would travel to North Carolina to pick up "bricks" of fentanyl.[4]

Det. Altman testified that he believed the information he received about Defendant was credible because the sources were all consistent with each other. Further, Pedro had provided credible information in the past that had led to multiple indictments and convictions. While Pedro was a paid informant, the other two sources were not paid informants, although one source was told the information she provided might help her in her own pending criminal case. Additionally, Det. Altman knew that the apartment belonging to Grip where two of the sources reported interacting with Defendant had been the location of controlled narcotics buys in the past. Det. Altman ultimately placed Grip's apartment under surveillance as part of the investigation into Defendant. While officers saw activity consistent with drug activity, such as numerous people coming and going from the apartment, with some of them entering and exiting through the

---

[4] An operations report prepared by Det. Altman about Defendant stated that he received information that Defendant travels to Myrtle Beach, South Carolina to obtain fentanyl, but this was not addressed during Det. Altman's testimony. At the same time, he did explain that it is not unusual for dealers to provide inaccurate information about the location of their drug buys to associates.

windows, no drug transactions were observed, and Defendant was not seen at the apartment during this time.

During Det. Altman's investigation, he further learned that Defendant had prior drug convictions in Virginia. He further discovered that Defendant had previously assaulted a police officer requiring the officer to get stitches, but Defendant was found not guilty of the aggravated assault charge levied against him as a result due to insanity.

After two of Det. Altman's sources provided him with Defendant's telephone number, which he then confirmed belonged to Defendant, he was able to further advance his investigation by obtaining a pen register for Defendant's phone so that he could monitor Defendant's location. On February 28, 2023, this monitoring allowed Det. Altman to determine that Defendant appeared to be travelling to North Carolina, where Defendant had purportedly previously obtained large quantities of fentanyl. Det. Altman then began planning an operation during which officers would attempt a traffic stop of Defendant on Interstate 26 ("I-26") after Defendant reentered Tennessee. In preparation for the traffic stop, Det. Altman prepared an Abbreviated Operation Plan ("ops plan") that included information regarding Defendant, and specifically noted that Defendant "is extremely dangerous and is expected to be armed at all times." [Doc. 41-1, p. 2].[5] Information was also provided in the plan about Defendant's girlfriend, with whom he was believed to be travelling, and vehicles in which they had previously been seen travelling, about a maroon Toyota Camry and a gold minivan. The ops plan advised that neither Defendant nor his girlfriend had a valid driver's license. The plan was shared with several members of law enforcement from different agencies, although it was not initially shared with any members of the Tennessee Highway Patrol ("THP").

---

[5] The ops plan was also admitted as Exhibit 1 to the hearing.

Det. Altman continued to monitor Defendant's location through the pen register and observed that Defendant travelled through North Carolina to Greenville, South Carolina, where he made a brief stop before beginning his return trip. Once Det. Altman determined that Defendant was on his way back to Tennessee, the decision was made to have THP conduct the traffic stop. At that point, Det. Altman emailed the ops plan to THP Trooper Christopher Vaughan ("Trooper Vaughan"). Additionally, both Det. Altman and Trooper Vaughan testified they had a brief telephone conversation before the stop during which they went over the ops plan and Det. Altman made sure Trooper Vaughan was aware that Defendant was considered very dangerous.

In the early morning hours of March 1, 2023, while still using information received as a result of the pen register to track Defendant's location, Det. Altman personally observed a maroon Toyota Camry travelling on I-26W that was speeding. Det. Altman believed it to be the vehicle in which Defendant was traveling and sped up to catch up to it. Although Det. Altman could not see into the vehicle to determine whether Defendant was inside because it was dark, he did confirm that the car's registration matched the information of the car Defendant had been seen in previously. Det. Altman then notified Trooper Vaughan via radio communication of the location of Defendant's vehicle and Trooper Vaughan conducted a traffic stop on the Camry. Det. Altman pulled off the interstate approximately 75-100 yards behind where the traffic stop occurred and waited. Det. Altman could see the scene of the stop from his location but could not make out detail due to the darkness and flashing emergency lights. Although he could not say how much time had passed after he pulled in, at some point he heard what sounded like screaming coming from the area of the stop. Det. Altman called Trooper Vaughan to see what was happening, and Trooper Vaughan advised that Defendant was yelling from the passenger seat of the car. Shortly after this phone call, Det. Altman reported to the scene of the stop and confirmed Defendant's identity. He

eventually spoke with Defendant and asked for the code to his phone. Det. Altman testified that he confirmed Defendant had been Mirandized before asking him any questions.

Trooper Vaughan has worked for THP since mid-2019. Prior to joining THP, he worked for the Mt. Carmel, Tennessee Police Department for two years. Trooper Vaughan testified that he frequently conducts traffic stops for other law enforcement agencies upon request. According to Trooper Vaughan, after he reviewed the ops plan and spoke with Det. Altman, he asked THP Trooper Joshua Barner ("Trooper Barner") to assist him with the traffic stop and shared the information he received about Defendant. During his testimony, Trooper Barner confirmed that Trooper Vaughan asked for his assistance and verbally provided him with information about Defendant, but Trooper Barner did not receive a copy of the ops plan before the stop.

Trooper Vaughan first observed the maroon Toyota Camry that Defendant was reportedly travelling in at approximately 2:30 a.m. on I-26W near mile marker 33. Trooper Vaughan was aware that neither Defendant or his girlfriend had a valid driver's license and observed the vehicle going 75 mph in a 65-mph zone. Trooper Vaughan initiated a traffic stop and testified that he called in a request for a canine as soon as the vehicle stopped because he knew it would take some time for a canine to arrive given the location of the stop. Trooper Barner arrived on the scene at approximately the same time as Trooper Vaughan and called the stop in to dispatch.[6] According to Trooper Vaughan, he was more cautious than normal due to the information he had received about Defendant prior to the stop. The vehicle pulled over without incident, and Trooper Vaughan approached the driver's side and spoke with Defendant's girlfriend, Margaret McLaughlin ("Ms. McLaughlin"), and observed Defendant in the front passenger seat. He also noticed overnight bags

---

[6] Both Troopers Vaughan and Barner were wearing body cameras during the stop and the body camera footage was introduced as Exhibits 2 and 3 to the hearing. Portions of the body camera footage were played during the hearing, and the Court advised that it would review the entire footage in conjunction with issuing its R&R.

in the back seat. Trooper Vaughan asked Ms. McLaughlin to step out of the vehicle and ran her driver's license for local warrants. Defendant was instructed to remain in the vehicle and keep the door closed. When asked, Ms. McLaughlin told Trooper Vaughan she and Defendant had gone to a barbeque restaurant in North Carolina for dinner and were returning home. She was unable to provide the name of the restaurant, but reported it was open until midnight and she and Defendant had eaten late. Trooper Vaughan stated he did not think Ms. McLaughlin's story was believable and thought they had been on a much longer trip based on the overnight bags in the car. He confirmed that Ms. McLaughlin's driver's license was suspended, and Defendant advised that he did not have a driver's license. Trooper Vaughan explained that he was unable to simply issue a citation to Ms. McLaughlin and allow her to drive away because neither she nor Defendant had a valid driver's license. He also advised that he could not allow them to leave the scene on foot because I-26 is a controlled access roadway where pedestrian traffic is prohibited. However, Trooper Vaughan allowed Ms. McLaughlin to call someone to come to the scene to pick them up or drive the vehicle for them.

Defendant remained in the passenger seat of the vehicle while Trooper Vaughan was speaking with Ms. McLaughlin and running a warrants check. Trooper Vaughan said Defendant was kept in the vehicle because he was potentially dangerous, and officers could observe him while he was in the car. Trooper Vaughan also took the car keys, so Defendant was unable to drive away. According to Trooper Vaughan and Trooper Barner, even though Defendant remained in the car as instructed, he opened the door several times after being instructed to leave the door closed and was observed making furtive movements inside the car. At one point, Defendant told officers he was moving around because he was cold and was looking for a jacket; however, Defendant was already wearing multiple layers, and Trooper Barner instructed Defendant not to reach into the

backseat. Another time, Defendant said he was moving around because he was looking for cigarettes and a third time Defendant said he had spilled a drink on himself and was trying to clean it up. Trooper Barner testified that Defendant appeared nervous, and he found Defendant's quick movements inside the car to be suspicious. He also did not believe Defendant's story that he had spilled a drink and thought it might be an attempt at a diversion.

Approximately 40 minutes after the vehicle was initially stopped, but before anyone arrived to pick up Ms. McLaughlin and Defendant, a canine officer arrived on the scene. Trooper Vaughn placed Ms. McLaughlin in his patrol car and instructed Trooper Barner to place Defendant in his patrol vehicle while the canine sniff was conducted. Trooper Barner asked Defendant to get out of the vehicle and began to conduct a patdown of Defendant. According to Trooper Barner, he believed the patdown was necessary for officer safety because of the information he received that Defendant was armed and dangerous and due to Defendant's suspicious behavior while he was sitting in the car. Trooper Vaughan was standing on the driver's side of the car and could see Defendant through the car's windows. While Trooper Barner was patting down Defendant, Trooper Vaughn saw that Defendant was wearing an empty gun holster. Trooper Vaughan alerted Trooper Barner, and Trooper Barner asked Defendant where the guns were that went in the holster. Defendant responded that they were "locked up." Defendant also told Trooper Barner that he was wearing a bullet proof vest. After completing the patdown, Trooper Barner advised Defendant he was not under arrest but was being detained based on reasonable suspicion that he had a firearm. Defendant was handcuffed with his hands behind his back, and Trooper Barner placed Defendant in the back passenger seat of his patrol vehicle. Defendant's window was down while he sat inside the vehicle. However, Trooper Barner was standing outside the rear passenger door of the vehicle

monitoring Defendant. There were also several other officers standing around the vehicle while Defendant was inside.[7]

The canine gave a positive alert, and law enforcement,[8] including Trooper Vaughan, began searching Defendant's vehicle. Inside the vehicle, officers found a revolver, which Ms. McLaughlin claimed ownership of, a glass pipe, and a locked lockbox. Trooper Barner was watching Defendant in the back of his patrol car while the search of the vehicle took place and noticed Defendant fiddling with a plastic bag containing a white substance that appeared to be methamphetamine. Trooper Barner can be heard on his body camera footage telling Defendant not to "toss" whatever white stuff was in his pocket. [Ex. 2, 49:20]. Defendant then offered to give Trooper Barner what was in his pocket and Trooper Barner told him to just "sit tight." A few seconds later, Trooper Barner told Trooper Vaughan that Defendant offered to give him whatever white stuff was in his pocket but clarified that he had not asked Defendant any questions about it. Trooper Vaughan then approached Trooper Barner's patrol vehicle, reached through the window, and removed the bag, asking Defendant what it was in the process. Defendant advised the bag contained "go." Trooper Vaughan asked Defendant if "go" meant methamphetamine and Defendant responded that it did. Trooper Vaughan then asked Defendant what was in the lockbox found in Ms. McLaughlin's car and Defendant stated, "that's where the guns are stored." [Ex. 2, 50:50]. Trooper Vaughan asked for the code to open the lockbox, and Defendant refused. Trooper Vaughan then asked Defendant if it was his box, and Defendant stated that it was. Trooper Vaughan continued to talk to Defendant about the lockbox and its contents, and asked Defendant if he was a convicted felon. Defendant was not Mirandized before these questions were asked.

---

[7] This can be seen on Trooper Barner's bodycam video. [Ex. 2, at 48:05].
[8] By this point in the stop, members of multiple law enforcement agencies were on the scene including THP, TBI, and the Sullivan County Sheriff's Department.

During their continued exchange, Trooper Vaughan asked Defendant for the code to the lockbox multiple times and told Defendant if he did not provide the code the box would be forced open. Trooper Barner also attempted to convince Defendant to provide the lockbox code. At this point, approximately two minutes after they began speaking, Trooper Vaughan administered a "partial" *Miranda* warning to Defendant, advising Defendant of his right to remain silent. [Ex. 2, 52:39]. Trooper Vaughan then asked Defendant if the guns inside the lockbox belong to Ms. McLaughlin and Defendant said they did. He then continued to ask Defendant for the code to the lockbox. After Trooper Vaughan walked away, Defendant told Trooper Barner that the lockbox was recently purchased and he had just set the code, so his wife[9] did not know it yet.[10]

Trooper Barner testified that he noticed Trooper Vaughan did not administer a complete *Miranda* warning to Defendant, so he borrowed a *Miranda* card from another officer on the scene and read Defendant his full *Miranda* rights approximately six minutes after Defendant was questioned by Trooper Vaughan.[11] [Ex. 2, 56:37]. After being fully Mirandized, Defendant affirmatively waived his rights and agreed to speak to officers. Trooper Barner then questioned Defendant about the guns in the lockbox. Shortly thereafter, Trooper Vaughan reapproached Defendant and Trooper Barner advised Trooper Vaughan that he had read Defendant his *Miranda* rights. [Ex. 3, 1:00:59]. Trooper Vaughan then asked Defendant again for the code to the lockbox. Defendant did not provide the code, and officers forced open the box and found two pistols and a digital scale inside. [Ex. 3, 1:03:34].

After the lockbox was opened, Trooper Vaughan got Defendant out of Trooper Barner's car so he could conduct a more thorough search of his person. [Ex. 3, 1:05:38]. During this search,

---

[9] Defendant consistently referred to Ms. McLaughlin as his wife although they are not legally married.
[10] Trooper Barner was present the entire time Trooper Vaughan was speaking with Defendant.
[11] The United States concedes that the statements Defendant made from the back of Trooper Barner's patrol car before being Mirandized should not be admitted at trial.

officers found a loaded pistol in Defendant's pocket and a fake battery containing 16 grams of suspected fentanyl. While he was being searched, Defendant asked to speak to a TBI Agent with whom he had spoken earlier. During his testimony, Trooper Vaughan identified the TBI Agent as Scott Lott ("Agent Lott"). Agent Lott had also attempted to advise Defendant of his *Miranda* rights earlier, but Defendant interrupted him and told him he had already heard his rights. [Ex. 3, 1:45:00]. While he was being searched, Defendant stated to Agent Lott that he was guilty of possessing the gun found in his pocket. [Ex. 3, 1:07:41]. Defendant was placed under arrest for possession of the firearms and narcotics. No one ever arrived to pick up Ms. McLaughlin, and she was also arrested.

### III. ANALYSIS

The Fourth Amendment guarantees "[t]he right of the people to be secure ... against unreasonable searches and seizures...." U.S. Const. amend. IV. A traffic stop by a police officer is a "seizure" within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). A traffic stop is permissible when law enforcement has "reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Slater*, 209 F. App'x 489, 495 (6th Cir. 2006) (quoting *United States v. Hensley*, 469 U.S. 221, 227 (1985)). During a traffic stop, both the driver and passengers of the vehicle are "seized within the meaning of the Fourth Amendment and thus may challenge the legality of the stop." *United States v. Campbell*, 549 F. 3d 364, 371 (6th Cir. 2008) (citing *Brendlin v. California*, 551 U.S. 249, 250 (2007)). Consequently, a passenger may also challenge the length of detention after the stop is made. *Id.* A traffic stop may last no longer than necessary to accomplish the purpose of the stop. *United States v. Rodriguez*, 575 U.S. 348, 354 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "Authority for the seizure thus ends when the tasks tied to the traffic infraction are—

or reasonably should have been—completed." *Id.* (citing *United States v. Sharp*, 470 U.S. 675, 686 (1985)). Specifically, "a seizure may not be unreasonably prolonged in order to enable [a] canine sniff to occur." *United States v. Samuels*, 443 F. App'x 156, 162 (6th Cir. 2011). During a traffic stop, officers may order drivers and passengers out of the vehicle. *United States v. Noble*, 762 F.3d 509, 521 (6th Cir. 2014). Further, officers may perform a patdown of a driver or passenger only "upon reasonable suspicion that they may be armed and dangerous." *Id.* (quoting *Knowles v. Iowa*, 525 U.S. 113, 118 (1998)).

Here, Defendant challenges both his seizure and patdown. First, Defendant challenges the length of the traffic stop, arguing that the 40-minute detention of Defendant prior to the canine sniff exceeded the time necessary to complete the purpose of the stop. Defendant further argues that officers lacked the necessary reasonable suspicion to pat him down when he was asked to exit the car. The Court will address each of these issues in turn before addressing Defendant's argument that statements he made to officers are inadmissible.

### a. The Length of the Traffic Stop

While "[a]n investigative detention must be temporary and last no longer than necessary to effectuate the purpose of the stop[,]" there is no bright-line limitation on the length of a lawful detention. *United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) and citing *United States v. Winfrey*, 915 F.2d 212, 217 (6th Cir. 1990)). Instead, to determine whether the length of detention was reasonable, the court must "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant…" *Id.* (quoting *United States v. Sharp*, 470 U.S. 675, 687 (1985)). Moreover, "the police may extend a stop beyond the scope of what was originally permissible 'if something happened *during the stop*

to cause the officer to have reasonable and articulable suspicion that criminal activity is afoot." *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012) (quoting *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)) (emphasis in original). "In determining whether reasonable suspicion was present, a court must consider the totality of the circumstances." *Orsolini*, 300 F.3d at 728. "'[F]actual inferences drawn by the law enforcement officer must be given 'due weight' in analyzing the totality of the circumstances." *Id.* at 729 (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)).

As an initial matter, the Court notes that neither Ms. McLaughlin nor Defendant had a valid driver's license, and it is impermissible for pedestrians to walk along I-26. *See* Tenn. Code Ann. §§ 55-8-101, 127; *see also Orsolini*, 300 F.3d at 730. As such, it was necessary for Ms. McLaughlin and Defendant to be detained until a legal means for them to leave the scene was available or until they were placed under arrest. Given these circumstances alone, the Court would find that the stop was not unconstitutionally extended.

Officers further provided information which leads the Court to conclude that they had reasonable suspicion to await the arrival of a canine unit. Specifically, the officers testified that Defendant seemed nervous, disobeyed instructions, and was making quick movements inside the vehicle. Additionally, Ms. McLaughlin's explanation for where they had been did not add up, and officers observed bags in the back seat of the car which were indicative of overnight travel in contradiction to Ms. McLaughlin's story. When these facts are considered in conjunction with the information Det. Altman had gathered from his sources about Defendant being a drug dealer who was generally armed,[12] and the knowledge the detective had through use of the pen register that

---

[12] While the officers on the scene did not obtain this information personally, under the collective knowledge rule, it is permissible for officers to rely upon information from other officers in formulating reasonable suspicion. *See United States v. Lyons*, 687 F.3d 754, 765-66 (6th Cir. 2012).

Defendant was returning from out-of-state travel consistent with a drug buy, officers also had reasonable suspicion that criminal activity was afoot sufficient to warrant the extension of the stop for further investigation. *See Orsolini*, 300 F.3d at 730 (holding that a 35-minute detention before the arrival of a canine on the scene of a traffic stop was not an unreasonable length of detention, particularly given that much of the delay occurred because the canine was off duty). For these reasons, the Court finds that the length of Defendant's detention prior to the canine's arrival was reasonable and did not violate Defendant's rights under the Fourth Amendment.

### b. The Patdown of Defendant's Person

The Court now turns to Defendant's assertion that officers lacked reasonable suspicion to pat him down when he was asked to exit the vehicle. An officer may only perform a patdown of a driver or passenger during a traffic stop "upon reasonable suspicion that they may be armed and dangerous." *Noble*, 762 F.3d at 521. Defendant likens the facts in this case to those in *Noble*, where officers claimed reasonable suspicion to conduct a patdown based on Noble's extreme nervousness, suspicions by a DEA Task Force that the vehicle in which Noble was travelling was involved in drug trafficking, and the officer's training and experience that people involved in narcotics often carry a weapon to protect themselves. *Id.* at 522. The Sixth Circuit found that the facts in *Noble* did not support a finding of reasonable suspicion to justify a patdown. *Id.* at 524. The court supported its decision by reasoning that, among other things, nervousness is not a reliable indicator of dangerousness, and a person's mere presence in a car suspected of being involved in drug trafficking "is not an automatic green light for frisking that person." *Id.* at 523. The *Noble* court further noted that the officer did not recognize Noble as a person with a criminal history and did not notice Noble fidgeting, and Noble complied with all commands. *Id.* at 523-24. Finally, the court noted that even after noticing Noble's nervousness, the officer evaluated the

window tint of the car and performed a field sobriety test on the driver of the car before frisking Noble. *Id.* at 523. Still, the *Noble* court noted that it was a close case. *Id.* at 522.

The United States argues that this case is distinguishable from *Noble* and likens it to instead to *United States v. Pacheco*, 841 F.3d 384 (6th Cir. 2016). There, the Sixth Circuit found that reasonable suspicion did exist to permit a patdown based upon the totality of the circumstances. Those circumstances included a detailed and corroborated tip that the individuals inside the vehicle in question were engaged in drug trafficking, the strong association between drug trafficking and firearms, the extreme and escalating nervousness of the defendant, and the defendant's fidgeting and failure to obey commands. *Pacheco*, 841 F.3d at 392-94.

The Court agrees that the circumstances of Defendant's patdown more closely resemble those in *Pacheco*. Here, prior to the stop, law enforcement had detailed information regarding Defendant's likely involvement in drug trafficking, including information regarding where he allegedly picked up drugs. Further, and perhaps more importantly, multiple sources had advised law enforcement that Defendant was violent and frequently carried a gun, and that information was included in the ops plan that had been provided to the troopers conducting the patdown prior to the traffic stop. The troopers also knew from the ops report that Defendant had previously been convicted of selling narcotics, had assaulted an officer, and likely had mental health issues because he had been found not guilty of assaulting the officer by reason of insanity. After the vehicle was stopped, Defendant appeared nervous, made quick, furtive movements while inside the vehicle, and repeatedly disobeyed officers commands to remain still and keep the door closed. While it is concerning that officers allowed Defendant to remain in the car for 40 minutes before he was frisked, this delay does not negate all the other factors that indicated Defendant was likely to be

armed, dangerous, and potentially mentally unstable. As such, the Court finds that officers had reasonable suspicion to conduct a patdown of Defendant.

### c. Defendant's Statements

*Miranda* warnings must be given before an individual is subjected to custodial interrogation. *United States v. Malcolm*, 435 F. App'x 417, 420 (6th Cir. 2011) (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). "The Supreme Court has defined 'custodial interrogation' as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Id.* (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). The Sixth Circuit has instructed that the following factors should be considered in making a custody determination:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police…and acquiesced to their requests to answer some questions.

*United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998). Of these factors, one of the most important is whether an officer explicitly informs a suspect that he is not under arrest. *See Coomer v. Yukins*, 533 F.3d 477, 487 (6th Cir. 2008) (stating perhaps the most significant factor in determining that the defendant was not in custody was that an officer told the defendant that she was not under arrest several times).

The United States concedes that the statements Defendant made from the back of Trooper Barner's patrol car before being Mirandized are not admissible because they would have been made in response to custodial interrogation. Rather, the relevant inquiries here are whether the statements Defendant made during the patdown are admissible and whether statements Defendant

made after he was Mirandized were tainted by the pre-*Miranda* questioning of Defendant such that they are inadmissible.

### 1. *Defendant's Statements During Patdown*

Generally, "'the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody.'" *United States v. Abdi*, 827 F. App'x 499, 506 (6th Cir. 2020) (quoting *Maryland v. Shatzer*, 599 U.S. 98, 113 (2010)). Here, although Defendant had been instructed to remain in the car during the time leading up to the patdown, he was able to move freely inside the car. Additionally, during the patdown Defendant was specifically told he was only being detained and was not under arrest. Officers only began asking Defendant questions upon discovering that Defendant was wearing a gun holster and their questions were narrowly tailored to determine the location of any firearms that might pose an immediate threat to officers' safety. Finally, the nature of this questioning was not hostile or coercive. Given these circumstances, Defendant was not in custody during the patdown, and statements made during the patdown are admissible.[13]

### 2. *Defendant's Post-Miranda Statements*

Finally, Defendant argues that any statements he made after being advised of his *Miranda* rights are still inadmissible because they are tainted by Defendant's pre-*Miranda* questioning. The Supreme Court has stated:

> [i]t is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.

---

[13] Even if Defendant had been in custody during the patdown, his statements would be admissible under the public safety exception to *Miranda* because officers had a reasonable belief that defendant might have a weapon. *United States v. Riley*, 658 F. App'x 390, 395 (6th Cir. 2017) (citing *New York v. Quarles*, 467 U.S. 649, 659 (1984)).

*Oregon v. Elstad*, 470 U.S. 298, 309 (1985); *see also Singleton v. Carter*, 74 F. App'x 536, 542 (6th Cir. 2003). "The threshold issue when interrogators question first and warn later is whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Missouri v. Seibert*, 542 U.S. 600, 611-12 (2004); *see also United States v. Woolridge*, 64 F.4th 757, 760 (6th Cir. 2023) ("'[P]ost-warning statements remain admissible if the *Miranda* warnings nevertheless functioned effectively—if the warnings informed the suspect that he had a genuine choice to continue speaking."). "[W]hen *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" *Seibert*, 542 U.S. at 613-14 (quoting *Moran v. Burbine*, 475 U.S. 412, 424 (1986)). There are several factors that bear on whether *Miranda* warnings administered after a defendant has already been subject to questioning can be effective, including "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615.

The United States does not seek to introduce any statements Defendant made pre-*Miranda*, nor does it seek to introduce statements Defendant made immediately after being Mirandized by Trooper Barner. [Doc. 48, p. 7]. Instead, the United States seeks to introduce the "second statement" Defendant made, which was given to Agent Lott a few minutes after Defendant was questioned by Troopers Vaughan and Barner. The initial questioning of Defendant primarily focused on the suspected methamphetamine Defendant had in his possession and the lockbox troopers had found when they searched the car. The United States concedes that Defendant also

offered an explanation regarding the lockbox in his second statement to Agent Lott, but notes that this statement covered new ground as well, namely, the firearm found on Defendant's person. As for the timing and setting, the bouts of questioning occurred approximately 15 minutes apart, and the setting varied only in that Defendant was initially questioned while inside Trooper Barner's patrol car but was standing just outside the patrol car when he gave the second statement. The police personnel questioning Defendant did change since Agent Lott was not involved at all in the pre-*Miranda* questioning of Defendant. Accordingly, Agent Lott's questioning would not reasonably appear to be continuous with the initial interrogation. Further, the interaction between Agent Lott and Defendant occurred because Defendant asked to speak to the agent. Although Agent Lott did not advise Defendant of his *Miranda* rights at that time, as noted above, Agent Lott had attempted to do so earlier, and Defendant advised him that he had already been read his rights. Moreover, while questioning Defendant, Agent Lott did not reference the statements Defendant had made to Trooper Vaughan.

The Court finds *United States v. Woolridge*, 64 F.4th 757, 760 (6th Cir. 2023) to be particularly instructive on this issue. There, the Sixth Circuit found that a defendant's post-*Miranda* statement was admissible even though he had made statements to law enforcement before he was given his *Miranda* warnings because his post-*Miranda* statement was given voluntarily and without coercion. *Id.* In reaching this decision, the *Woolridge* court noted that the defendant appeared eager to speak to officers, even asking officers to come speak to him, and "chose to speak after being informed of his rights, a reality that proves highly probative of voluntariness." *Id.* (cleaned up). Woolridge also interrupted the officer advising him of his *Miranda* rights, telling him "I know my rights, sir." *Id.* at 759. The court also noted that the officer "did not employ systematic, exhaustive, or coordinated questioning" and "never pushed for a confession or exploited Woolridge's unwarned statements." *Id.*

Here, as in *Woolridge*, Defendant freely spoke with officers at every opportunity, even requesting that officers come and talk to him. Defendant also interrupted Agent Lott when he was trying to advise him of his rights under *Miranda* stating he had already been read his rights, and by that point, Defendant had been fully advised of his *Miranda* rights by Trooper Barner. Additionally, it does not appear that Agent Lott ever attempted to use Defendant's earlier statements to obtain a confession. While the Court finds the circumstances of this case present a close call, particularly given that Defendant's second statement was given mere minutes after his first, Defendant's location had not meaningfully changed, and the subject matter of the two statements overlapped significantly, the Court finds that the *Miranda* warning provided to Defendant was effective and the voluntariness of Defendant's second statement was not compromised, especially given that Defendant initiated the contact leading to the second statement. *See Wooldridge*, 64 F. 4th at 760-61. As such, Defendant's post-*Miranda* statement to Agent Lott should be admitted.

## IV. CONCLUSION

For the reasons outlined above, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress [Doc. 32] be **GRANTED** by agreement as to the statements Defendant made while in Trooper Barner's patrol car prior to being Mirandized and in all other respects be **DENIED**.[14]

Respectfully submitted,

/s/Cynthia Richardson Wyrick
United States Magistrate Judge

---

[14]Any objections to this report and recommendation must be served and filed within **fourteen (14) days** after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582 (6th Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).